UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:10-CV-230-KSF

SHERRY AYTES, et al.                                                                    PLAINTIFFS

vs.                                       **OPINION AND ORDER**

FEDERAL EXPRESS CORPORATION                                          DEFENDANT

* * * * * * * *

This matter is before the Court on the motions of Federal Express Corporation ("FEC") for summary judgment against all Plaintiffs.  For the reasons discussed below, the motions will be granted in part and denied in part.

I.      **BACKGROUND**

In August 2009, Plaintiffs Penni Foreman ("Foreman") and Lori Parsley ("Parsley") filed EEOC Charges of Discrimination against FEC.  On April 14, 2010, the EEOC issued Right to Sue notices to Foreman and Parsley.  Plaintiffs Sherry Aytes ("Aytes"), Foreman, and Parsley filed their Complaint against FEC on July 13, 2010 and moved to file an Amended Complaint on August 18, 2011 to add additional claims regarding other coworkers and retaliation claims.  [DE 1, DE 39].  The motion to amend was granted September 23, 2011, and additional discovery was authorized.  [DE 50, DE 56].

Plaintiffs' claims include sexual harassment claims by Foreman and Parsley under Title VII of the Civil Rights Act of 1964 ("Title VII"), sexual harassment under the Kentucky Civil Rights Act ("KCRA") by all three Plaintiffs, retaliation in violation of Title VII by Foreman and Parsley, and retaliation in violation of the KCRA by all Plaintiffs.  Plaintiffs demand compensatory and punitive damages. [DE 49].

### A.   Plaintiff Aytes

Plaintiff Aytes began working for FEC on September 21, 2004 as a "swing driver," which meant that she filled in for other drivers, rather than having a regular route. [Aytes Dep. 13, 17]. She claims that after she had worked there for a week or two, Michael Tubbs ("Tubbs") walked by, looked her up and down, and made some inaudible comment.  *Id.* at 24.  One or two weeks later, they were passing each other between two trucks parked close to each other; Tubbs put his arm up to stop her as they were next to each other and said, "How about some strange?" *Id.* at 26.  She angrily asked him what he was doing and wasn't he married, at which point he put his arm down and let her pass.  *Id.*  After that, she claims he reacted angrily toward her, told coworkers she was lazy, and told them she was having an affair with a coworker.  *Id.* at 28-31, 45.

The next year during peak season, she felt she had more stops than she could deliver.  *Id.* at 31.  She told her boss, Tom Fusco, who told Tubbs to pick up the overflow.  Tubbs threw a fit and said: "I am not going to take stops so that lazy bitch can lay down and do nothing."  *Id.* at 32. Fusco directed Tubbs to Fusco's office, and Aytes left.  *Id.*  She later heard from a coworker that Tubbs was "written up over the incident."  *Id.* at 33.

At some later date, Aytes was upset and crying most of the day.  At the end of the day, she went to Fusco's office and said "Mike is running me down to everyone in the station that will listen. I said ... he's telling them bad things about me that aren't true, and ... you've got to make him stop." *Id.* at 52.  Fusco told her she was one of the best swing drivers they had, that "we know how Mike [Tubbs] is," and that she needed to ignore him.  *Id.* at 50-52.

About a month later, she again went to Fusco to complain that Tubbs was still talking about her and what he was saying about her was not fair.  *Id.* at 54.  Fusco said she needed to "toughen up."  *Id.*  She testified that she talked to Fusco about Tubbs after that, but her schedule would get worse after she complained.  *Id.* at 55.  She would be assigned "split shifts or the doubles" and night shifts.  *Id.* at 74-76.  She requested one of three days off to register her daughter for school.

2

She was assured she could take off, but each day her schedule changed so that she could not. *Id.* at 99. She stayed quiet for about four months, but then saw Fusco again and asked when he was ever going to say anything to Tubbs. Fusco asked why she thought he had not said something to Tubbs, and she responded that Tubbs is "still talking about me." *Id.* at 56.

Aytes wanted to move up into management, but FEC required prospective managers to attend "Aspire" classes, which were only offered occasionally. Employees were signed up for the classes by their manager. Aytes said she asked Fusco to sign her up for the next class, but Fusco said he forgot. She complained to Harry Ehney, the general manager, who told Fusco to get her in the next class, which he did. *Id.* at 65-66.

In October 2006, Aytes received a regular route and Curt Norwood ("Norwood") became her supervisor. *Id.* at 61. When she made mistakes in getting boxes on the truck of coworker David Rinesmith, he became particularly angry, threw boxes, yelled and called her names, like stupid bitch. *Id.* at 62. Once, he called her a cunt. *Id.* at 93. She immediately went to Norwood and told him that Rinesmith was throwing boxes and calling her names. She claims that Norwood merely shrugged his shoulders. *Id.* at 63.

Aytes testified that in 2006, her coworker and friend, A. B.,[1] called Aytes and told her that Tubbs squeezed A.B.'s breasts. A.B. did not want to tell Norwood because her "husband would kill [her] if he found out." *Id.* 81-83.

Aytes alleges one other personal incident involving Mitch Helvey, a coworker, in November 2007. One day when Helvey delivered late freight to her on her route, he grabbed her breasts. She never reported it. *Id.* at 69. Aytes left her employment at FEC on December 25, 2007, claiming that she could not take it any more. *Id.* at 83.

---

[1] Persons who were victims of harassment, but are not parties to this lawsuit, will be identified by initials only in this opinion.

After Aytes left, Lori Parsley took her route and came to Aytes' new employer to make a delivery. Parlsey was crying and eventually told Aytes that Tubbs grabbed her breast. Aytes offered to do "anything that I could to help her do something about [Tubbs]." *Id.* at 83-84.

### B.    Plaintiff Foreman

Penni Foreman began working as a courier for FEC on May 8, 1994. [Foreman Dep. p. 10]. In mid- to late-2007, her route changed so that she returned to the courier room later in the day and began encountering Tubbs. *Id.* at 19, 35. Despite having plenty of room to walk by, he would brush her with his arm. *Id.* at 20. No one else was in the room at the time. *Id.* at 22-23. When he touched her, she would say, "Dude, you know, why do you have to touch me?" *Id.* at 26-27.

About a month later, he began making verbal comments in addition to brushing her. *Id.* at 20. One evening, she was in a bad mood and slammed her stuff down on the counter. Tubbs said, "What's the matter, Penni? Didn't you get a good fucking last night?" Then he laughed. *Id.* at 19, 27-28. She asked, "Why do you have to say that?" *Id.* at 28. The next occurrence was on a Friday about two weeks later, and he asked what she was going to do that weekend. When she said she had no plans, Tubbs asked, "Well, are you going to go home and suck your husband's dick all weekend?" *Id.* at 28. He asked her if she got a good fucking a total of three times. *Id.* at 35. As he left the courier room, he would "smack [her] on the butt." There were never any witnesses to these incidents. *Id.* at 29.

On another occasion when they were in the courier room, Tubbs said, "Penni, what size bra do you wear? You've got nice-looking titties." *Id.* at 29. Another time when he was standing close and she reached under the counter, he said, "Oh, while you're down there." She interpreted this as a request for a blow job. *Id.* at 31. One Friday, he asked about her weekend plans and said, "You know, if you ever want any strange, you know you can come to me." *Id.* at 55.

On another occasion, Tubbs' wife, Ann, who also worked with FEC, came out of the break room to return to her truck. Foreman was standing beside Tubbs, and he said, "Look at her. I

4

don't know how she's walking.  I tore that shit up last night." *Id.* at 40-41.  Another time as coworker T. B. walked by, Tubbs said to Foreman, "Boy, she's got some big old titties." *Id.* at 42. Regarding a coworker, N. H. , Tubbs commented to Foreman, "Boy, if I could ever get a hold of that, she would never want another woman again." *Id.* at 120.  She also observed Tubbs walking by Parsley and making noises every day from the time Parsley first complained about Tubbs until Parsley complained again. *Id.* at 120.

Foreman, Parsley and Ann Tubbs have daughters about the same age.  Around Halloween, they all went to the horse park with other couriers and their children for a Halloween get together. *Id.*  Ann invited Foreman and Parsley to their camp site, but within five minutes after their arrival, Tubbs "started talking sexual."  Foreman told Parsley they needed to go. *Id.* at 43.

In early 2008, Foreman  was again in the courier room at the counter, and Tubbs walked by brushing her with the genital area of his body and laughing. *Id.* at 46-47.  She jerked up and said, "Dude, don't do that." *Id.* at 47-48.  That same day, Fusco came by the courier room, and Foreman told him that Tubbs was getting "pretty nasty," and he needed to say something to Tubbs. She also said, "You know, coming from me, that it's got to be bad if I'm telling you." *Id.* at 48-49. She testified that Fusco laughed.  He did not ask her anything about what Tubbs was doing; he just laughed.  She decided not to press the issue; instead, she made a point of avoiding Tubbs thereafter. *Id.*  at 49.

The day Tubbs came back from his suspension in 2009 for sexual harassment, he said to Foreman, "What's up, ho?" *Id.* at 62.  Parsley asked Foreman to provide a written statement about Tubbs, and the next day Foreman's boss, Curtis Carr, said he understood that she had been harassed by Tubbs.  She was reluctant to get anyone in trouble, but Carr encouraged her to write a statement. *Id.* at 64-65.  After the statements were written, Della McCarty investigated. *Id.* at 74.  Foreman testified that McCarty's first question regarding Tubbs was, "What did you do to make

him think he could speak to you this way?"  *Id.* at 75.  Later, McCarty said, "Well, if you cuss, and

you're around him, that gives him the right in his mind that he can speak to you like this." *Id.* at 76.

Foreman also claims that there was retaliation after she filed her written statement about

Tubbs.  For example, she had been on light duty before with carpal tunnel in her hand and said

FEC was familiar with her restrictions.  In the past, she sat in the office and made calls to research

packages.  *Id.* at 98, 105.  After the complaint, she had hand surgery.  Her light duty assignments

this time, however, were to pull cans off trucks, pull freight out from underneath the belt to scan,

and pick up trash and cigarette butts in the parking lot.  *Id.* at 98-99.  She found the trash detail to

be "degrading" and unnecessary because FEC had a contract with a company to clean up trash

on all the grounds.  *Id.* at 99-102.  In fact, that company came the same afternoon.  *Id.* at 102.  She

also claims that FEC knew she was not supposed to be grabbing anything following the surgery,

but they assigned her to pull freight out from underneath the belt.  Working with this freight also

violated her weight restrictions.  *Id.* at 103-104.  She said others on light duty simply worked in the

office all day, but she and Parsley were assigned to pick up trash, move boxes, and carry boxes

out to a shed.  *Id.* at 105.

### C.    Plaintiff Parsley

Lori Parsley went to work as a courier for FEC on November 26, 2007. [Parsley Dep., p. 11].

On June 5, 2009, she went on a leave of absence for foot surgery.  She returned to work on light

duty on April 4, 2011, but went back on a leave of absence on May 26, 2011.  *Id.* at 12.  In April or

May of 2008, she first loaded Tubbs' truck, but she did not see him.  *Id.* at 24.  Later, he began

making comments two or three times a week.  He would tell her to look how his wife is walking and

say that he wore her out last night.  Regarding T. B., a coworker, Tubbs would say, "Her breasts

are so large; ... I would like to stick my whole face in there."  He said Parsley's breasts were large,

too, but his wife's were small.  *Id.* at 26.  One day N. H.  was climbing down off her truck, and

6

Tubbs told Parsley and T. B. that if N. H.  would ever be with him, she would never want a girl anymore and that she needed a real man.  *Id.* at 30-31.

In December 2008, Tubbs told Parsley that she should "suck [her] husband's dick and report it back to him when [she] returned to work."  *Id.* at 31.  Parsley told Tubbs that he was "nasty" and she didn't do that.  Tubbs told her she was boring and she should do what he said. Parsley told Tubbs not to talk to her like that again and that she was going to tell his wife.  *Id.* at 32-33.  She did not report that incident because it is "embarrassing to go to someone and say that at that point.  And I kind of hoped he would go away.  I avoided him if I could."  *Id.* at 33.

During December or January, a friend of Parsley's and a coworker named Browning told Tubbs and others that she and Parsley, when in their 20's, attended a "pimp and a ho party" and Parsley was dressed as a hooker.  After that, Tubbs would say to Parsley every morning, "Good morning, hooker.  How are you?"  Two other coworkers also joked with her about it.  She did not report those incidents.  *Id.* at 50-53.

On January 2, 2009, Parsley was handling someone else's route and got back later than usual.  She had a number of packages to bring back in and needed help, so she asked Tubbs to help her.  He came up into the truck and, when she reached for a bin, he grabbed her left breast. She told him never to touch her like that again and she was going to tell his wife.  Tubbs just laughed.  *Id.* at 35-37.  She did not tell anyone because she "didn't feel they would believe me." *Id.* at 37.  She was abused as a child and warned that no one would believe her if she told.  *Id.*

On January 20, 2009, Parsley was in her truck and getting ready to leave.  Tubbs opened the truck door and grabbed her breast again.  She slammed the door and "let him know how nasty I thought he was."  Tubbs responded, "I'm nasty," and made an "evil laugh."  *Id.* at 40.  She cried for several minutes and then left on her route and called her mother.  Next she called a coworker, Randall Pitts, who told her she should tell her manager, Norwood.  Parsley called Norwood while he was on vacation, told him that Tubbs had grabbed her twice, and asked that Tubbs be moved

away from her.  Norwood first said he would address the issue when he returned on Monday, but he called back in about an hour and said she should give Fusco a written statement as soon as she came in off the road that day.  *Id.* at 41-42.  That same day, she made a delivery to Sherry Aytes, who asked her what was wrong.  Aytes told Parsley that Tubbs did things to her, too.  *Id.* 43, 45.

Parsley met with Fusco at the end of the day and was told to write a statement about what happened and to include any other incidents.  Fusco tore up her first statement because it was not specific enough, and Parsley prepared a second statement.  *Id.* at 45.  Fusco called Della McCarty in Human Relations, who talked to Parsley for a few minutes on the phone and said she would be coming to see Parsley in a couple of days.  *Id.* at 57-58.

The next morning, Parsley was to check in with Fusco, but as she approached his office, Ann Tubbs was leaving.  Ann was crying and very angry.  When Parsley objected to having to listen to her at work that day, Fusco said, "She has every right to be angry.  That is her husband."  Later that day, Ann received a phone call while working and then began hollering, "This is bullshit.  This place is getting ready to have the biggest lawsuit they ever seen."  Fusco took Ann away for a while.  *Id.* at 63-65.  From other testimony, it is clear that Tubbs had been suspended for the day. [Tubbs Dep., p. 27].

McCarty came to Lexington a few days later and met with Parsley.[2]  She reviewed Parsley's statement, asked for more information, and advised Parsley that she could get counseling. [Parsley Dep., p. 58].

When Tubbs returned after his one-day suspension, he began a new behavior of walking past Parsley several times each morning and laughing or giggling.  He would not speak, but would give her dirty looks.  She complained to Norwood four or five times, but Norwood would say he had not seen it.  One day in March 2009 as Tubbs was walking by, he brushed against Parsley's arm.

---

[2]  Plaintiffs' Response states that "McCarty never did go to the Lexington facility specifically to discuss Parsley's complaints regarding Tubbs."   [DE 64, p. 37].  That statement is contradicted by Parsley's testimony. [Parsley Dep., p. 58].

She complained to another manager, Curtis Carr, who asked her to write a statement.  Parsley wrote a third statement, and McCarty met with her again.[3]   Some point after that, Tubbs was required to walk in front of Parsley's truck and other vehicles to get to his truck, and his truck was moved three or four trucks away from Parsley's.  *Id.* at 70-75, 80-83, 86-88, 90-91.

One morning later, Parsley was sitting on the front bumper of her truck crying.  Phillip Reed, a coworker asked her what was wrong, and Parsley said she did not like working there any more and wanted to quit.  Reed said, "Don't you let him run you off," and Parsley responded: "I don't think that they believe me.  I just think that none of them believe me."  Reed left to get Fusco, but General Manager Ehney came to see Parsley instead.  Ehney told her that they would be keeping an eye out and watching Tubbs. *Id.* 93-94.

Subsequently, a job came open at the Louisville station, and Parsley bid on it.  The job was given to another worker from Lexington, Lynn Browning.  Parsley complained that Browning was not qualified for the job, and Browning's offer was rescinded.  Parsley was then offered a position in Louisville that she claims was more difficult and not comparable. *Id.* 108-114.  Accordingly, she did not accept it.  Parsley also complained about being told to clean up trash and unload cans off a truck while she was on light duty and had restrictions on pushing, pulling, and weight over five pounds.

### D.    Other Incidents

A.B. worked as a courier at FEC from June 1, 2004 until September 2007.  [A.B. Dep. p. 7].  Fusco was her supervisor for the first year and a half of her employment, and Curtis Carr was for the remainder. *Id.* at 9.  A.B. testified that Tubbs made multiple vulgar comments to her five to ten times about her breasts, saying he liked them and would like to touch them. *Id.* at 10.  One time, a coworker, Ray Casper, overheard Tubbs and told A.B. she should talk to management

---

[3]  Plaintiffs' Response again is contradicted by Parsley's testimony. [Parsley Dep. pp. 87-88].  The Response states: "McCarty did not meet with Parsley or conduct an investigation in response to the written complaint Parsley submitted in March 2009." [DE 54, pp. 39-40].

about it.  *Id.* at 10, 13.  On one occasion, Tubbs did touch A.B.'s breasts.  *Id.* at 16, 23.  She reported the incident and Tubbs' prior comments about her breasts to her manager, Carr, and he apparently discussed it with Tubbs.  Tubbs apologized to A.B. and said he would not do it again.  *Id.* at 14-16, 24.  She said these incidents probably occurred in 2006, a year before she left FEC.  *Id.* at 25.

S. G. started working at FEC in September 2006.  [S. G. Dep., p. 27].  Tubbs told her he thought she was "hot," despite knowing that she was gay.  *Id.* at 17.  She rebuked him, saying she would sleep with his wife before she would sleep with him.  He responded, "Well, I'd like that, too."  *Id.* at 17-18.  After the third or fourth comment from Tubbs, S. G. reported it to Fusco, but she did not want to go on record with anything.  *Id.* at 27.  On another occasion, she was sitting in the car with her brother-in-law who also worked at FEC.  Tubbs came up and kissed her "dead on my lips."  *Id.* at 18.  S. G. reported it to Fusco, but said she did not want to get Tubbs fired.  She did not know about the others.  *Id.* at 26.  She estimated the time frame as the middle of 2007.  *Id.* at 27.

S. G. also testified that Tubbs would jump in a truck while she was loading it and grab her from behind, grinding his penis into her.  This happened multiple times, whenever she was in a truck alone.  Sometimes he grabbed her on her shoulders; other times he grabbed her inner thighs.  *Id.* at 35-37.  He would tell her he wants to sleep with her and do things to her that nobody's done.  He told her if she slept with him, she would never be gay again.  *Id.* at 66-67.  Tubbs also told her he wanted to videotape her and have a threesome so he could watch her have sex with her girlfriend.  *Id.* at 75.

S. G. reported to Fusco that she was being harassed by Tubbs and Bill Doughty, and she did not want to train with those two men alone on their routes.  She did not give him specifics because he did not ask her.  He told her to "stay clear" and said, "I will not let you ride with them alone."  *Id.* at 75-78.

10

S. G. was off work on long-term disability in 2009 through the fall of 2010.  In mid-2010, she was getting phone calls from Foreman and others regarding harassment complaints.  She called Fusco and learned it was about Tubbs.  She was off work with medical issues and told Fusco she did not want to have anything to do with it.  Fusco responded, "Well, that's probably smart, [S. G.]" *Id.* at 26-29.

As S. G. was ready to return to work in 2010, she was scheduled for Doughty's route, but she reminded Fusco that he agreed not to put her with Doughty.  When Fusco asked if she was really serious about this, S. G. described how Doughty hugged her while he was erect.  Fusco agreed to change her assignment and not train her on the route with Doughty.  *Id.* at 96-97.

D. S. talked to Fusco in 2009 about a week after Parsley claimed Tubbs harassed her.  D.S. told Fusco that she would believe Parsley's complaints because Tubbs did the same thing to her. Fusco asked when that happened.  D. S. told Fusco it was a year and a half ago, and he said, "Well, it wouldn't matter. It's over six months." [D. S. Dep., p. 10].

### E.    FEC's Motions For Summary Judgment

In moving for summary judgment on the Plaintiffs' harassment claims, FEC relies primarily on two defenses.  It argues most of the claims are barred by the six-months contractual period of limitations.  For any claims not barred, FEC argues that management had no notice regarding most incidents.  For those incidents that were reported, it claims prompt and effective action was taken.

FEC highlights its anti-harassment and discrimination policies and procedures in place.  At the outset of employment, each employee was given a copy of the FEC Employee Handbook. [Aytes Dep., pp. 18-19; Foreman Dep., pp. 13-15, 17; Parsley Dep., pp. 19-20 ].  The Handbook references the policies and procedures for reporting any complaints of sexual harassment or retaliation. [McCarty Decl. at ¶ 4].  Plaintiffs were also aware of FEC's "People Manual" containing personnel policies, including those on sexual harassment and retaliation. [Aytes Dep., pp. 19-20; Foreman Dep., pp. 15-17; Parsley Dep., pp. 20-21].   Those policies require that any sexual

harassment or retaliation immediately be reported to management, human resources or the HR Compliance Department to allow FEC to conduct an investigation while evidence is fresh and available. [McCarty Decl. at ¶¶ 6-7].

McCarty conducted sexual harassment and retaliation training for front-line hourly employees in Lexington in May 2005, August 2005, September 2005 and August 2007. She included a discussion of FEC's policies and how to recognize and report sexual harassment and retaliation. *Id.* at ¶ 8. FEC's Managers Ehney, Fusco, Norwood, Carr, Sparks and Darnell all received sexual harassment and retaliation training prior to 2006 and again in April 2011. The training included FEC's policies and what to do when an employee came to them with a complaint of sexual harassment and retaliation. [Ehney Decl. at ¶ 7; Fusco Decl. at ¶ 13; Norwood Decl. at ¶ 3, Carr Decl at ¶3; ¶3;Sparks Decl at ¶ 3; Darnell Decl. at ¶ 3]. The specific facts in support of FEC's defenses and related arguments are set forth in the arguments below.

## II.    ANALYSIS

### A.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In other words, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

**B.      Contractual Period Of Limitations**

1.      <u>Waiver by FEC</u>

Plaintiffs argue vigorously that FEC waived any limitations defense by not asserting it as an affirmative defense in its first responsive pleading. [DE 64, 51-57]. The Court disagrees. Plaintiffs initially sued FedEx Corporation ("FDX"). [DE 1]. FDX filed an answer denying all claims and affirmatively asserting numerous defenses, including that it did not employ any of the Plaintiffs and that some or all of the claims "may be barred by applicable statutes of limitation." [DE 20]. In *Ray v. Fedex Corporate Services, Inc.*, 668 F. Supp. 2d 1063, 1066 (W.D. Tenn. 2009), the court held that an allegation of a statute of limitations bar encompasses contractual limitations.

Following FDX's Answer, defense counsel stipulated that FEC could be substituted as the proper defendant. [DE 27]. After entry of the stipulation, FEC filed an Answer asserting an affirmative defense of claims barred by statutes of limitations, "including the contractual limitations provision contained in their employment applications." [DE 33, p. 10 ¶ 1]. Thus, the affirmative defense of limitations was asserted in the first responsive pleading filed by FEC. When Plaintiffs' First Amended Complaint was filed [DE 50], FEC again answered and asserted the defense of

contractual limitations. [DE 53, p. 12 ¶ 1]. Accordingly, the Court finds that the limitations defense was raised in the first responsive pleadings and was not waived.

Although Plaintiffs complain about the delay associated with the defense, the parties' Scheduling Order was amended to allow limited discovery on Plaintiffs' new retaliation claims raised after the deadline for completion of general discovery and on the contractual limitations defense. [DE 56]. Plaintiffs also submitted declarations in response to FEC's summary judgment motions, which declarations addressed the issue of contractual limitations. The Court finds that Plaintiffs have not suffered any prejudice relating to the contractual limitations defense.[4]

The cases on which Plaintiffs rely for their waiver argument involve facts that are not comparable to the present case. For example, *Hayden v. Ford Motor Co.*, 497 F.2d 1292 (6th Cir. 1974), involved a delay of nearly thirty months after suit was filed, and the plaintiff was seriously prejudiced by acting to her detriment in dismissing a state court action. Similarly, in *Haskell v. Washington Township*, 864 F.2d 1266 (6th Cir. 1988), the delay was more than three years.

### 2.   The Contractual Limitation Is Generally Enforceable in Kentucky

In *Order of United Commercial Travelers of America v. Wolfe*, 331 U.S. 586, 608 (1947), the court said: "[I]t is well established that, in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period." The Sixth Circuit has held that "there is nothing inherently unreasonable about a six-month limitations period contained in an employment agreement." *Thurman v. DaimlerChrysler*, 397 F.3d 352, 353 (6th Cir. 2004). *See also Myers v. Western-Southern Life Ins. Co.*, 849 F.2d 259, 262 (6th Cir. 1988) ("There is nothing inherently unreasonable about a six-month limitations period."). Kentucky courts have held that "[p]arties are

---

[4] Plaintiffs assert they were prejudiced because counsel was not aware of this defense at the time of their depositions and did not prepare them. [DE 64, p. 56]. Their declarations, however, appear to address any additional testimony they may have given.

at liberty to contract for a limitation period less than the period fixed by statute." *Munday v. Mayfair Diagnostic Laboratory*, 831 S.W.2d 912, 914 (Ky. 1992).  Additionally, federal district courts in Kentucky have upheld shortened contractual limitations periods for bringing legal action against an employer.  *Thornton v. Western & Southern Financial Group Beneflex Plan*, 797 F. Supp.2d 796, 809 (W.D. Ky. 2011) ("[T]he Court finds that the six-month limitations period on the employment agreement is reasonable."); *Dunn v. Gordon Food Services*, 780 F. Supp. 2d 570, 576 (W.D. Ky. 2011) ("[T]he Court finds that a waiver in an employment application is congruent with Kentucky law and that this particular waiver is reasonable on its face.").

Other district courts in this Circuit have upheld the same FEC contractual limitation period as the one at issue here.  *Boaz v. Federal Express Corp.*, 742 F. Supp.2d 925, 933 (W.D. Tenn. 2011) ("[T]he court agrees with Fed Ex. that procedural rights of the FLSA can be abridged by contractual limitations."); *Thompkins v. Federal Express Corp.*, No. 2:09-cv-02073, 2010 WL 1780232 at *2 (W.D. Tenn. April 30, 2010) ("The Court finds that the limitations period is reasonable under the circumstances of this case...."); *Ray v. Fedex Corporate Services, Inc.*, 668 F. Supp.2d 1063, 1067 (W.D. Tenn. 2009) ("By accepting employment with FedEx Services, Plaintiff accepted the terms of the Employment Agreement....").  *See also Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707 (7th Cir. 2004) (We find the six-month limitations period enforceable under Tennessee law); *Badgett v. Federal Express Corp.*, 378 F. Supp.2d 613, 625 (M.D.N.C. 2005) ("The court finds the limitations clause to be substantively reasonable under the circumstances."). Accordingly, Plaintiffs' argument that the contractual limitations provision is generally unenforceable in Kentucky is not well taken.  These authorities also refute Plaintiffs' argument that KRS 413.265 precludes shortening a limitations period.  *Munday* and *Thornton* post-date that statute.

        3.   <u>What Must Be Filed Within Six Months</u>

The employment application says:

To the extent the law allows an employee to bring **legal action** against FedEx Express, I agree to bring that **complaint** within the time prescribed by law or 6

months from the date of the event forming the basis of my **lawsuit**, whichever expires first.

[DE 72-1, 72-2, 72-3; emphasis added].  Plaintiffs argue "that complaint" references "legal action," which would encompass administrative filings. [DE 64, pp. 58-59].   FEC, on the other hand, contends that all the terms mean the same thing – a lawsuit.

Relying on Dictionary.com, FEC says "legal action" is defined as:  "a judicial proceeding brought by one party against another; one party prosecutes another for a wrong done or for protection of a right or for prevention of a wrong."  http://dictionary.reference.com/browse/legal+-action?s=t.  "Complaint" is defined in its legal sense as:   "the first pleading of the plaintiff in a civil action, stating the cause of action."   http://dictionary.-reference.com/browse/complaint?s=t. USLegal.com does not define "legal action," but does define "action."   "An action is a judicial proceeding brought by one party against another seeking redress of a wrong or for protection of a right or for prevention of a wrong."  http://definitions.-uslegal.com/a/action/.   "Complaint" in the latter source adds a little complexity.   "In a lawsuit or administrative dispute, a complaint is the initial document filed with the court or other authority by a person or entity claiming legal rights against another."   http://definitions.uslegal.com/c/complaint/.   Thus, a document filed in an administrative proceeding may satisfy the definition of a "complaint."

In *Ravenscraft v. BNP Media, Inc.*, 2010 WL 1541455 (N.D. Ill. April 15, 2010), the employment application said that an employee "shall not commence any action or other legal proceeding related to [her] employment or the termination thereof more than six months after the event complained of and agrees to waive any statute of limitations to the contrary."  *Id.* at *1.   The court held that "filing a charge with the EEOC or a state agency would have constituted 'any action or other legal proceeding.'"  *Id.* at *5.   Plaintiffs Parsley and Foreman argue they filed their complaints with the EEOC within six months and, thereby, satisfied the contractual limitations period. [DE 64, pp. 58-59].  FEC replies that "Foreman's KCRA ... charge wasn't filed until over six

months after her alleged harassment ended." [DE 67 p. 10 n. 13].  The timeliness of Foreman's state law claims is addressed separately below.

The phrase, "other legal proceeding related to her employment," in *Ravenscraft* has a breadth that is missing in the FEC application here.  Accordingly to the dictionaries, the common meaning of "legal action" and "action" is a judicial proceeding.  Plaintiffs have not cited any authority to the contrary.  Accordingly, it is the opinion of the Court that Plaintiffs were required to file their lawsuits within six months of the events forming the bases of their lawsuits.

### 4.   The Contractual Limitations Period And Civil Rights Cases

Plaintiffs first note, correctly, that the KCRA is interpreted consistently with Title VII.  *Gibson v. Finish Line, Inc. of Delaware*, 261 F. Supp.2d 785, 789 (W.D. Ky. 2003).  Relying on cases from other jurisdictions, they argue that the contractual six-month limitations period is incompatible with the administrative procedures for civil rights cases, particularly the exclusive jurisdiction of the EEOC for 180 days to investigate a claim. [DE 64, pp. 70-71].

In response, FEC first reaffirms that it has not asserted a contractual limitations defense for any of the Title VII claims.  [DE 67, p. 11].  Second, it notes that the KCRA does not have a condition precedent for administrative exhaustion, nor any period of exclusive jurisdiction.  *Id.*  Accordingly, the Title VII cases are distinguishable and have no application to the KCRA claims.

### 5.   Plaintiffs Accepted The Employment Agreement By Signing It And Accepting Employment.

Plaintiffs contend there was no "acceptance" of the Employment Agreement because there was no "opportunity to assent." [DE 64, p. 61].   To the contrary, the Agreement begins: "If employed, in consideration thereof, ... I do hereby agree."   It ends: "I have read this entire Agreement, which consists of 2 pages, and I thoroughly understand its content," followed by a place for a date and signature.  [DE 72]  Each of the Plaintiffs dated and signed the one or two-page Employment Agreement, which states in bold, capital letters at the top: "**IMPORTANT – PLEASE READ AND SIGN**."  *Id.*

There is no evidence that the Plaintiffs were coerced to sign the Agreement against their will.  They certainly had the choice of not signing it and foregoing employment with FEC.  By dating and signing it, they agreed to its terms in the event they were employed.  Several days or weeks after each application was submitted, FEC offered each Plaintiff employment based on the terms of the signed Agreement.  "By accepting employment with [FEC], Plaintiff[s] accepted the terms of the Employment Agreement."  *Ray v. Fedex Corporate Services, Inc.*, 668 F. Supp. 2d 1063 (W.D. Tenn. 2009).

6.      Plaintiffs' Waivers Were Knowing and Voluntary

Plaintiffs argue that they did not make knowing and voluntary waivers of the Kentucky five-year statute of limitations because they hurried to complete the applications and did not read all of the Employment Agreement.  Moreover, they claim they would not have understood it even if they had read it.  [DE 63, pp. 6-15, 61-67].

Immediately before the signature line is an affirmation that the applicant has read the entire Employment Agreement and thoroughly understands it.  Immediately preceding that language in Foreman's application is the following statement: "To the extent the law allows an employee to bring legal action against Federal Express, I agree to bring that complaint within the time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever expires first."  The same language is at the bottom of the Aytes and Parsley applications, but another paragraph follows before the signature. [DE 72, Exs. 1-3].

In their declarations, Plaintiffs claim an abbreviated time for review, a lack of legal experience or education, and the fact that no one called the shortened statute of limitations to their attention or suggested reviewing it with an attorney. [DE 64, Ex. 9 (Foreman Decl.), Ex. 10 (Aytes Decl.), Ex. 11 (Parsley Decl.)].  Plaintiff Aytes picked up the employment application, drove home to complete it, and returned it to Federal Express that same day. [DE 64, Ex. 10].  There is no evidence that she was unable to make a copy of it, unable to ask any questions about it, or was

prohibited by Federal Express from contacting an attorney to explain anything she did not understand.

Plaintiff Foreman said she was taken to a break room to complete the application and that she did so quickly in order to be through before a manager came back for an interview.  She focused on her work history and did not read every word on each page "because I was not given enough time to do so." [DE 64, Ex. 9].  There is no evidence that she asked for more time and was refused, that she asked for any explanations during her interview, that she asked for a copy, or that she was coerced by FEC to sign it against her will.

Plaintiff Parsley declared that she went to a meeting with other applicants, including her friend Browning.  They were provided applications and cautioned to provide complete, accurate information, especially about their work history.  They were encouraged to complete the application quickly as a few managers were waiting to discuss the jobs available.  She states in her declaration that she did not have enough time to read each word on each page. [DE 64, Ex. 11].  In her deposition, she was asked, "Is there any reason you would think that you did not have an opportunity to review or read it?"  Her answer was, "No, but I don't remember reading it, and I don't want to say I did."  There was no evidence that she asked for more time, asked her friend for any explanation, asked the managers any questions or was coerced by FEC to sign the Employment Agreement involuntarily.  Instead, the recruiter that administered the application process for Parsley, Mary Ann Endsley, testified that generally applicants have "two-and-a-half to three hours" to complete the application.  [DE 67-3, pp. 43, 75]. During that time, Endsley was constantly available to answer questions.  *Id.* at 45.

 "In general, a person who has the opportunity to read a contract, but does not do so and signs the agreement, is bound to the contract terms unless there was some fraud in the process of obtaining his signature."  *Cline v. Allis-Chalmers Corp*, 690 S.W.2d 764, 766 (Ky. 1985).  Plaintiffs have not made any claim of fraud.  "One who signs a contract cannot seek to avoid it on

the basis that he did not read it or that he supposed it was different in its terms.  *Mannix v. County of Monroe*, 348 F.3d 526, 533 (6th Cir. 2003).  In affirming a decision that a plaintiff was bound by the terms of an application, the Sixth Circuit said: "She had an obligation to seek assistance before she signed if she felt she did not understand the application."  *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 461 (6th Cir. 1986).

Plaintiffs rely on cases in which there was a waiver of a substantive right, such as the right to trial by jury, to argue that closer scrutiny should be given to the waivers here.  However, the applicable statute of limitations is a procedural, not substantive, matter.  *Mahalsky v. Salem Tool Co.,* 461 F.2d 581 (6th Cir. 1972).  Plaintiffs did not waive their right to bring their claims, only the time period in which they could bring them.  Additionally, there was no undisclosed process, such as arbitration proceedings, about which Plaintiffs lacked information.

With respect to Plaintiffs' experience, background and education and the amount of time in which to consider whether to sign the waiver, courts have held waivers involving similar circumstances were knowing and voluntary.  In *Sako v. Ohio Dept. of Administrative Services*, 278 F. App'x. 514, 518 (6th Cir. 2008), the Sixth Circuit held the employee voluntarily executed a waiver, despite the fact he was a French-speaking African immigrant with only a high school education and had only a few minutes to sign the agreement.  The court held that the document was brief and "could easily be read and understood," and there was no basis to find that the waiver was unknowing.  Sako did not request more time to consider the situation and was not pressured into signing the agreement.  *Id.* at 519.  Similarly, in *Dunn v. Gordon Food Services, Inc.*, 780 F. Supp.2d 570, 577 (W.D. Ky. 2011), a high school education and inability to consult a lawyer were not sufficient to "show lack of knowledge or voluntariness."  Similarly, in the present case, the Plaintiffs did not ask for assistance or for more time and have failed to show that their waiver was not voluntary.

7.   <u>Whether Aytes' Claims Were Timely</u>

All of Sherry Aytes' claims were filed under the KCRA.  She began her employment with FEC in September 2004 as a swing driver and received a regular route in October 2006. [Aytes Dep., pp. 13,17, 61].  She left FEC on December 25, 2007.  *Id.* at 83.  Within a few weeks of beginning her employment, Aytes claims Tubbs stopped her passage between two trucks and said, "How about some strange?"  *Id.* at 24, 26.  She testified that, "After that instance, we didn't have contact." *Id.* at 29.  Her subsequent claims about Tubbs were that he told others that she was lazy, started rumors that she was having an affair, and refused on one occasion to take some of her stops.  *Id.* at 28-31, 45.  Aytes claims that she complained to Fusco on three occasions, but said only that he was talking about her and running her down to other employees.  *Id.* at 50-56.

After Aytes was given her own route in 2006, she complained that another courier, David Rinesmith, threw boxes at her and called her "stupid bitch" and "cunt."  *Id.* at 62-63.  Norwood and Ehney recall Aytes complaining about Rinesmith throwing boxes, but she did not complain about any inappropriate language.  Norwood and Ehney told Rinesmith to control his temper and issued an online counseling for his behavior.  Thereafter, they did not receive any similar complaints.  Ehney Decl. at ¶ 17; Norwood Decl. at ¶ 18.  Finally, Aytes claims that shortly before she resigned in December of 2007, another courier Mitch Helvey, grabbed her breasts in the back of a truck, but she did not report this incident to anyone. [Aytes Dep., pp. 68-70].

Assuming the truth of all of Aytes' allegations for purposes of this summary judgment motion, her claims against FEC were not filed until July 2010, two and a half years after her resignation.  The limitations period in the FEC Employment Agreement that she signed is six months.  Accordingly, all of Plaintiff Aytes' claims are time barred.

8.   <u>Whether Foreman's Claims Were Timely</u>

Foreman began working part time in May 1994. [Foreman Dep. 10].  From 2006 to the present, during the times Foreman actively worked, her immediate manager was Curtis Carr.  [Carr

Decl. at ¶ 14; Ehney Decl. at ¶ 19].   In mid- to late-2007, her route changed, and she came in contact with Tubbs more often. [Foreman Dep., pp. 19, 35].   The details of her claims of sexual harassment by Tubbs during 2007 and 2008 are set forth in the Background discussion above. In early 2008, Foreman was in the courier room alone with Fusco and told him that Tubbs was getting pretty nasty and that "it's got to be bad if I'm telling you." *Id.* at 49.   Fusco simply laughed. *Id.*   She decided thereafter to stay as far away from Tubbs as she could.   She testified that the last time she felt she was harassed by Mike Tubbs in any way was in early 2008.  *Id.* at 36-37.   Despite that testimony, Foreman said that the day after Tubbs came back to work following his first suspension, he said to her, "What's up ho?"  *Id.* at 62.   Tubbs' first suspension was on or about January 21, 2009. [Parsley Dep., pp. 45-46; DE 65, Ex. JJ].

Foreman filed her charge of discrimination with the EEOC on August 10, 2009. [DE 64, p. 2].   Her suit against FEC was filed July 13, 2010.  *Id.* at 3.   Because the KCRA does not have any period of exclusive jurisdiction comparable to Title VII, the limitations period on Foreman's state sexual harassment claims expired in July 2009, at the latest.   Accordingly, Foreman's state sexual harassment claims must be dismissed as untimely.

With respect to Foreman's Title VII claims, FEC argues there is no evidence that Tubbs' comment of "What's up, ho?" reasonably could be understood to constitute sexual harassment or have anything to do with Foreman's gender.   [DE 67, p. 12].   FEC relies on definitions from dictionary.com for interjections used to attract attention, as in *Westward ho!* or *Land ho! Id.* at 13. That same source defines "ho" as a noun meaning "a derogatory term for a woman" from "Black or Southern US pronunciation of whore."   http://dictionary.reference.com/browse/ho?s=t.   The questioning of Parsley mentions "a pimp and ho party" she attended many years before. [Parsley Dep., p. 51].   There is little doubt what is meant by the term "ho" in that context.   At a minimum, there is a question as to whether Tubbs' comment in 2009 was part of a continuing pattern of sexual harassment contributing to a hostile work environment.   FEC acknowledges that, under a

continuing violation theory, a court may consider acts contributing to a hostile work environment outside of the 300 days before filing an EEOC charge if at least one act within the period fits the definition. [DE 67].

FEC argues that the solitary comment in 2009 is too remote to resurrect Foreman's untimely complaints of hostile work environment.  [DE 67, p. 14].  The remoteness of the comment must be considered in context, however.  After Foreman complained to Fusco about Tubbs in early 2008 and Fusco just laughed, Foreman decided to stay away from Tubbs.

> So every day that I came in, I would look.  If he was in the courier room, I did not go in the courier room.  If he was in the break room, I did not go.  If he was coming towards me, I would cut down beside a truck, because I was not going to put myself into that situation any longer.  I didn't – I didn't feel like I needed to.
>
> So it was a constant find Mike [Tubbs] so I don't have to listen to him.  And that's what I did.

[Foreman Dep., p. 49].

"To establish a continuing violation, plaintiff must first produce evidence of a 'current' violation taking place within the limitations period.  Second, plaintiff must show that the current violation ... is indicative of a pattern of similar discriminatory acts continuing from the period prior to the limitations period."  *Weigel v. Baptist Hospital of East Tenn*., 302 F.3d 367, 376 (6th Cir. 2002).  Until she began deliberately avoiding Tubbs, Foreman was repeatedly subjected to a pattern of comments about her sex life, directing her to go home and suck dick, what bra size she wore, that she had nice-looking titties, asking her for a blow job, that she could come to Tubbs if she ever wanted some strange, that a coworker had big old titties, and about Tubbs' sex life with his wife.  The first thing Tubbs said to Foreman when he saw her in 2009 was, "What's up, ho?"  In the opinion of the Court, the current comment is similar to and indicative of the pattern of prior discriminatory acts.

FEC relies on *Weigel* to argue that an eight-month gap between events was too long. [DE 64, p. 14].  However, in *Weigel*, the current act of refusing to hire bore no similarity at all to the prior

acts of discriminatory workload.  *Weigel*, 302 F.3d at 377.  Moreover, Weigel resigned and was away from all discrimination for eight months before the refusal to rehire.  Foreman, on the other hand, was still at work and constantly dodging a bullet in order to avoid sexually harassing comments.

Finally, FEC argues that Foreman failed to exhaust her administrative remedies regarding her claims of retaliation.  It notes that Foreman made no claim of retaliation in her EEOC charge and did not describe conduct that could be characterized as retaliation. [DE 42-1, p. 18].  Plaintiffs respond, however, that most of the retaliation occurred in the spring of 2011, after the EEOC charge was filed.  [DE 64, p. 114].  In *Weigel*, the court said that "retaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim foreseeable to defendants."  *Weigel*, 302 F.3d at 380.  *See also Delisle v. Brimfield Township Police Department*, 94 F. App'x 247, 252 (6th Cir. 2004) (subsequent adverse actions may be reviewed by the district court if reasonably related to the claims asserted before the agency).  FEC's motion for summary judgment for failure to exhaust will be denied on Foreman's retaliation claims.

Plaintiffs also note that their amended complaint was filed within six months of the alleged retaliation in 2011. [DE 64, p. 117 n. 53].  Accordingly, their state claims for this retaliation are not barred.  FEC agrees, but states it applies only to claims based on alleged retaliation in 2011. [DE 67, p. 12].

### 9.    Whether Parsley's Claims Were Timely

Plaintiff Parsley began work at FEC as a full-time courier on November 26, 2007.  [Parsley Dep., p. 11].  She testified to frequent inappropriate comments from Tubbs from August through December 2008.  In January 2009, he grabbed her left breast on two occasions.  After she reported these incidents, Tubbs began walking past Parsley's truck multiple times and laughing.  In March 2009, Tubbs brushed her arm as he walked past.  *Id.* at 70-74.  She reported the behavior to Carr, and an investigation ensued.  On June 5, 2009, Parsley went on medical leave for foot surgery.

On April 4, 2011, she returned to work on light duty status, but has been on long-term disability status since May 26, 2011. *Id.* at 11-12.

The last possible date that Parsley could claim to have been sexually harassed was March 2009. Since her KCRA claims were not filed until July 2010, they are barred by the six-month contractual statute of limitations.

FEC does not challenge Parsley's Title VII claims as untimely. It does argue, however, that her retaliation claims for conduct in the spring of 2011 were not exhausted by presentation to the EEOC. [DE 43-1, p. 24]. The Court rejects that argument for the same reasons discussed above regarding Foreman's claims of retaliation after her EEOC charge was filed. Additionally, Parsley asserted in her EEOC charge:

> Since her complaints about Tubbs, management has retaliated against claimant by alleging that her work performance was falling below par and attempting to prevent her from taking leave for a medically necessary procedure. Claimant requested a transfer to another facility. However, management gave the position to an employee with less tenure, and offered plaintiff a night-shift position with more physically demanding work.

[DE 64, p. 116]. Summary judgment will be denied on this issue.

### C.    Sex Discrimination Claims Based Upon Coworker Harassment

1.    Standard

Plaintiffs' claims of sexual harassment were brought under Title VII and the KCRA. Because all of the state-law claims are time barred, the merits of the claims of Foreman and Parsley are analyzed under Title VII.

"To establish a prima facie case based upon coworker harassment, a plaintiff must establish that (1) the sexual harassment was unwelcome; (2) the harassment was based on sex; (3) the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008). *See also*

25

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 276 (6th Cir. 2009) ("An employer is vicariously liable for co-worker harassment of which it knew or should have known if it failed to take appropriate remedial action, i.e., if its response manifests indifference or unreasonableness.").

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Hawkins*, 517 F.3d at 332-33. "To determine whether a work environment is 'hostile' or 'abusive,' courts look at the totality of the circumstances. The factfinder must evaluate the conduct at issue by both an objective and subjective standard. This requires a plaintiff to establish both that the harassing behavior was 'severe or pervasive' enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive. Summary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment." *Id.* at 333, internal citations omitted.

"[A]n employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999). "So, courts should aggregate hostile work environment claims, considering even those claims that were not directed at a particular plaintiff and those claims that a particular plaintiff did not witness. ... Implicit in the consideration of the totality of the circumstances is that a plaintiff was aware of the harassment that was allegedly directed toward other employees. ... In short, a plaintiff does not need to be the target of, or a witness to, harassment in order for us to consider that harassment in the totality of the circumstances; but he does need to know about it." *Berryman v. Supervalue Holdings, Inc.*, 669 F.3d 714, 718 (6th Cir. 2012).

Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not a "mathematically precise test." *Hawkins*, 517 F.3d at 333. The harassment must consist of more than words that simply have sexual content or connotations. "Instead, the

workplace must be permeated with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment.  A nonexhaustive list of factors for the court to consider include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*  "[S]exual comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive." *Id.*  "[W]hen a victim makes allegations of ongoing harassment, the 'inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of facts.'"  "This court has also made clear that harassment involving an 'element of physical invasion' is more severe than harassing comments alone." *Id.* at 334.

  "To establish that the employer 'knew or should have known' of the co-worker harassment, the plaintiff need not necessarily have reported it to a supervisor.  Where harassment is pervasive, knowledge may be imputed to the employer." *Gallagher*, 567 F.3d at 276.  "An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized – or is reasonably believed by a complaining employee to have been authorized – to receive and respond to or forward such complaints to management." *Id.* at 277.

     2. <u>Severe or Pervasive Harassment</u>

  FEC argues that many of the "facts" argued in the Response regarding Foreman are without factual support in the record.  It also claims that "[m]ost of Tubbs' comments to Foreman were about other people.  Accordingly, it contends that Foreman was subjected to "boorish and potentially offensive conduct that did not rise to the level of sexual harassment."  [DE 67, pp. 29-30].  Foreman testified that Tubbs began brushing her with his arm as he walked by. [Foreman Dep., pp. 20-23].  A month later, he added verbal comments in addition to brushing her. *Id.* at 20.  One evening he asked, "What's the matter, Penni?  Didn't you get a good fucking last night? *Id.* at 19, 27-28.  He asked this question three times. *Id.* at 35.  Three or four times as he left the

courier room, he would "smack [her] on the butt." *Id.* at 41.  Another time, he asked if she was

going to suck her husband's dick all weekend. *Id.* at 28.  On one occasion, he asked what size bra

she wore and commented that she had "nice-looking titties." *Id.* at 29.  As he stood close by while

she reached under the counter, he said, "Oh, while you're down there." *Id.* at 31.  One Friday, he

asked about her weekend plans and told her she could come to him "if you ever want any strange."

*Id.* at 55.  Another time, she was standing at the counter in the courier room and he brushed his

genital area against her behind and laughed.  *Id.* at 46-47.  Foreman said she was "always having

to look over my shoulder to see if he's there, to see if he's going to say something to me. ...  "I can't

go in the break room if he's there, because I don't want to hear it.  I can't go in the courier room."

*Id.* at 76.  Foreman also knew that Tubbs was harassing S. G.  Shortly after S. G. began work in

September 2006, she and Foreman discussed the fact that Tubbs was harassing them both. [S.G.

Dep., p. 33-35].  All of this is in addition to the comments Tubbs made to Foreman about other

women.

The foregoing conduct "is explicitly sexual and patently degrading of women.  The natural

effect of exposure to such offensive conduct is embarrassment, humiliation and degradation."

*Gallagher*, 567 F.3d at 271.  Elements of physical invasion were involved in the form of brushing

against Foreman and smacking her on the behind.  "[H]arassment involving an 'element of physical

invasion' is more severe than harassing comments alone.  *Hawkins*, 517 F.3d at 334.  The conduct

occurred frequently and had an obvious impact on work performance.  Foreman was always on the

lookout for Tubbs and could not go into work areas where she needed to go, just because he was

there.  There is no question but that Foreman faced a hostile work environment.

FEC also denies that the conduct testified to by Parsley constituted a hostile work

environment. [DE 67, pp. 30-31].  Parsley said Tubbs made comments two or three times a week

about wearing out his wife the night before; what big breasts T. B. had and that he wanted to stick

his whole face in there; that Parsley had large breasts, too; that N. H.  needed a real man; and

calling Parsley "hooker." [Parsley Dep., pp. 26, 30-31]. He asked her to suck her husband's dick on the weekend and report back to him. *Id.* at 31. On two occasions, Tubbs grabbed Parsley's breast. The day of the second grabbing, Parsley talked to Aytes, who told her that Tubbs "used to do things to her, too." *Id.* at 43,45. After Parsley filed a complaint against Tubbs, he began walking by her truck "at least three times every morning" and laughing. *Id.* at 70-71. She described it as a "smirky laugh" as if to say that he did not get in trouble and that nothing happened to him. *Id.* at 72. One day, he moved to brush up against her arm. *Id.* at 74. Her complaints to Norwood had not effected any change in behavior, so she complained to Carr. Only then, was she able to avoid Tubbs. At some point Parsley became aware of Tubbs' harassment of Foreman. Parsley was present at the Halloween event when Tubbs started "talking sexual" to Foreman. [Foreman Dep., pp. 42-43]. Parsley also asked Foreman to write a statement about Tubbs' harassment of Foreman. *Id.* at 64.

Once again, the harassment by Tubbs was frequent and sexually explicit. Parsley also suffered degrading physical invasion. She cried at work and felt as though no one believed her. She was so upset that she wanted to quit. *Id.* at 93-94. It is the opinion of the Court that the conduct involved was sufficiently severe and pervasive as to constitute a hostile work environment.

### 3.   Notice

FEC argues that Foreman and Parsley cannot meet the requirements for a prima facie case because they cannot show that FEC knew or should have known of sexual harassment. Plaintiffs assert that "eight known women told Fusco that Tubbs was sexually harassing them, some of them more than once." *Id.* at 119. The record does not support that overstatement. For example, Plaintiff Aytes never told Fusco, or any manager, about behavior of a sexual nature by Tubbs. She only complained to Fusco that Tubbs was "running her down" to other employees and that what he was "saying about her is not fair." [Aytes Dep., pp. 52, 54]. Aytes' only other complaint to

management was that Rinesmith threw boxes at her and gave her extra work.  [Aytes Dep., p. 63; Darnell Dep., pp. 12-14].

There is evidence of notice to management, however.  A.B. gave notice to her supervisor in 2006 that Tubbs made vulgar comments about liking her breasts and wanting to touch them.  On one occasion, Tubbs did touch her breast.  [A.B. Dep., p. 14].  She did not recall whether the report was to Carr or Fusco, but other testimony clarified that her supervisor in 2006 was Carr.  *Id.* at 7, 9.

S. G. testified that she reported Tubbs' harassing conduct to Fusco three times in 2007, but that she did not want to get him fired.  The first time was after three or four harassing comments from Tubbs. [S. G. Dep., pp. 26-27].  She also reported to Fusco an occasion when Tubbs kissed her on her lips.  *Id.* at 18, 26.  After Tubbs jumped in her truck multiple times and would grind his penis into her, she reported to Fusco that she was being harassed by Tubbs and Doughty and she did not want to train alone with those two men.  *Id.* at 75-78.  She never put anything in writing because she did not want to.  *Id.* at 26-27.  Fusco's response was that she should "just stay clear."  He also said, "I will not let you ride with them alone." [*Id*. at 75-78].  S. G. was out on disability for a time.  When she was returning to work in 2010, she told Fusco specifically how she had been harassed by Doughty because Fusco had assigned her to work with him.  Fusco changed the work assignment.  *Id.* at 97.

Plaintiff Foreman never formally reported the sexual harassment from Tubbs until March 2009 when Parsley asked her to provide a written statement and Foreman's supervisor, Carr, encouraged her to write a statement. [Foreman Dep., p. 64].  In early 2008, however, Foreman told Fusco, "You need to say something to Tubbs.  He's getting pretty nasty.  You know, coming from me, that it's got to be bad if I'm telling you."  *Id.* at 49.  She reported this to Fusco, rather than her supervisor, because she has known Fusco for many years, and she felt more comfortable talking to him.  *Id.* at 51-52.  She testified Fusco merely laughed.  *Id.* at 49.

FEC contends that "nasty" has many meanings and could have meant that Tubbs was not bathing or smelled bad. [DE 67, p. 21]. Unless Foreman had a habit of not bathing or smelling bad, that interpretation makes no sense in light of her accompanying remark that "coming from me, that it's got to be bad." FEC also ignores the additional definitions in its source of dictionary.com of "7. morally filthy; obscene; indecent: a nasty word" and in the World English Dictionary, "4. obscene or indecent." http://dictionary.reference.-com/browse/nasty?s=t. Additionally, the term must be put in context. Foreman's 2008 report that Tubbs was being nasty followed S. G.'s 2007 report to Fusco that Tubbs was harassing her, and she was afraid to work alone with him.

Plaintiff Parsley did not report Tubbs' comment in December 2008 that she should suck her husband's dick and report back to him because it was embarrassing and she "hoped he would go away." [Parsley Dep., pp. 30-33]. She also did not report any of the prior incidents. *Id.* at 34. Even when Tubbs grabbed Parsley's breast on January 2, 2009, she did not report it to anyone because she felt she would not be believed, based on her childhood experiences. *Id.* at 35-38. It was not until January 20, 2009, after Tubbs grabbed her breast a second time, that she reported the two January incidents and the December comment to Fusco. *Id.* at 40-45; DE 65, Ex. JJ. Fusco called Della McCarty of Human Resources immediately, obtained a statement from Tubbs denying the allegations, and placed Tubbs on a one-day investigative suspension. [DE 43-6, McCarty Decl., ¶¶ 14, 16].

Parsley claims she reported to Norwood once a week for two months after her initial report that Tubbs was walking by her truck and laughing, but Norwood did not observe any incidents. In March 2009, Parsley reported the walking by and laughing episodes to Carr and prepared a written statement. [Parsley Depo. 80-83]. Tubbs was forbidden from walking behind her truck and was given a three-day suspension. His truck was moved several trucks away. [DE 43-6, McCarty Decl., ¶¶ 22-26]. At some point after that, Parsley was crying and saying that she wanted to quit.

General Manager Ehney talked with her and told her that they would be watching Tubbs. [Parsley Dep., pp. 93-94].

Within a week after Parsley reported Tubbs' conduct, D. S. told Fusco that Tubbs had done the same thing to her.  Fusco asked her when, and she responded it was a year and a half ago. Fusco's reply was, "Well, it wouldn't matter.  It's over six months."  [D. S. Dep., p.10].

In summary, Carr received complaints about sexual harassment by Tubbs from two different women, one in 2006 and one in 2009.  Fusco received complaints about harassment by Tubbs from S. G. in 2007 (three times), Foreman in 2008 and Parsley in 2009.  He also learned in 2009 that Tubbs had harassed D. S.  "An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized – or reasonably believed by a complaining employee to have been authorized – to receive and respond to or forward such complaints to management."  *Gallagher*, 567 F.3d at 277.  FEC's Anti-Harassment policy states: "Any member of management who receives a report or complaint of sexual or other harassment must immediately report the complaint to HR or to the HR Compliance Department in Memphis, Tennessee, even if the complaining employee asks that no action be taken."  [DE 65, Ex. WW, p. 2].  Between them, Carr and Fusco had notice of three women harassed by Tubbs prior to 2009, yet neither of them made any report to HR.

The evidence is sufficient to raise a jury question regarding the notice of sexual harassment to FEC.  Summary judgment will not be granted on this basis.

4.   Appropriate Employer Response

FEC relies on Blankenship v. Parke Centers, Inc., 123 F.3d 868 (6th Cir. 1997), for the proposition that employer liability can only be imposed if the response is "so inadequate that it 'exhibits such indifference as to indicate an attitude of permissiveness that it amounts to discrimination.'" [DE 67, p. 32].  In *Hawkins*, the court clarified *Blankenship* as follows:

> *Blankenship* remains good law for the proposition that a company may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."

*Hawkins*, 517 F.3d at 338. *See also Collette v. Stein-Mart, Inc.*, 126 F. App'x. 678, 684 (6th Cir. 2005) ("*Ellerth* and *Faragher*, however, speak of the employer's duty to exercise 'reasonable care' in fashioning a remedy for unlawful discrimination. Thus, an employer may be held liable when its remedial response is merely negligent, however well-intentioned."). An employer is required "to show that it 'exercised reasonable care to prevent' this type of harassment." *Id.*

Following A.B.'s report to Carr in 2006 that Tubbs talked multiple times about liking her breasts, how she looked, that he wished she were not married and that he finally touched her breast on one occasion, Carr said he would discuss it with him. Thereafter, Tubbs came to A.B. to apologize and said that he would not do it again. [A.B. Dep., pp. 10-15].

After S. G. reported to Fusco in mid-2007 that Tubbs and another male employee were harassing her, Fusco told S. G. to "just stay clear" and that he "will not let you ride with them alone." [S. G. Dep., at 75-78]. Yet, when Foreman reported to Fusco in 2008 that he needed to say something to Tubbs because he's "getting pretty nasty," Fusco merely laughed. [Foreman Dep., p. 49].

In January 2009, when Parsley reported to Fusco that Tubbs grabbed her breast on two occasions and talked with her about sucking her husband's dick, Fusco contacted McCarty and placed Tubbs on a one-day investigatory suspension. Fusco did not advise McCarty that he had received complaints about Tubbs from S. G. in 2007 and Foreman in 2008. McCarty states she was advised of the complaint by Parsley. She also said that "no one had previously reported any harassment by Mr. Tubbs to human resources and there was no record of any such claim on file." McCarty Decl. at ¶¶ 14, 18. She issued a Warning Letter to Tubbs, which is the highest form of discipline short of termination. She "believed the Warning Letter would cause Tubbs to cease such behavior." *Id.* at ¶ 19.

When Parsley complained in March that Tubbs kept walking by her truck and laughing, McCarty again recommended investigative suspension. *Id.* at ¶ 22. She and Mr. Ehney agreed that Tubbs' truck should be moved. Ehney directed that Tubbs be told not to walk in front of Parsley's truck any more and that Norwood watch Tubbs to insure he did not engage with Parsley in an inappropriate way. *Id.* at ¶ 26.

"An employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser and is therefore on clear notice that the same employee has engaged in inappropriate behavior in the past." *Hawkins*, 517 F.3d at 341. The court cited with approval *Dees v. Johnson Controls World Servs., Inc.* 168 F.3d 417, 423 (11th Cir. 1999), which held that "knowledge of prior acts of harassment can support a claim that the employer had constructive knowledge of later acts by the same employee." *Hawkins*, 517 F.3d at 340. Carr and Fusco knew that Tubbs had harassed three separate women in the preceding three years, 2006-2008.

While FEC's sexual harassment policy is relevant to the question of whether FEC reasonably attempt to prevent harassment in the first instance, it does not absolve it from liability "if it knew or should have known about the harassing conduct yet failed to respond appropriately." *Id.* at 341. FEC is liable if its response to complaints by A.B., S. G., Foreman and Parsley "demonstrates an attitude of permissiveness and was not reasonably calculated to end [Tubbs'] pattern of harassment." *Id.*

Based on the foregoing evidence, there is a genuine issue of material fact as to whether, given that FEC knew that Tubbs had previously harassed other female employees, its failure to investigate the claims by S. G. in 2007 and Foreman in 2008 or to take additional steps designed to prevent future harassment manifested "indifference or unreasonableness in light of the facts." Accordingly, summary judgment is inappropriate as to Foreman's and Parsley's claims.

### D.    Retaliation Claims

Foreman claims that she was retaliated against when FEC required her to continue to work in close proximity to Tubbs following her complaint in March 2009,[5] ordered her to pick up trash around the facility while on light duty in 2011, and assigned to work involving moving heavy packages in violation of her medical restrictions for carpel tunnel syndrome surgery. [DE 64, pp. 102-03; Foreman Dep. 98-108].

Parsley claims that she was retaliated against when she was prevented from applying for and obtaining another job in Louisville, when her workload increased, when her route was assigned to another person after she was out on medical leave for ninety days, and when she was assigned to work that was beyond her physical capacity while she was on light duty.  *Id.* at 106.

When a plaintiff presents only circumstantial evidence of retaliation, the claims are analyzed under the *McDonnell Douglas/Burdine* evidentiary framework.  *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).  The plaintiff has the initial burden to prove a prima facie case of retaliation by showing that, "(1) he engaged in protected activity, (2) this exercise of his protected civil rights was known to the defendant, (3) the defendant thereafter took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.*  "The burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for its actions...."  "If the defendant satisfies this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation."  *Id.*

With respect to the assignment to pick up trash around the building, Plaintiff Foreman testified that it was degrading work and was not necessary in light of the company that had a

---

[5]  FEC argues that Parsley never asked to be moved away from Tubbs and never complained of any ongoing harassment.  Thus, she was never "required" to work close to him.

contract to clean up trash on all the grounds. [Foreman Dep., pp. 99-102].  In her seventeen years with FEC and the many times she had been on light duty, she had never been asked to do anything other than paperwork in the office.  *Id.* at 105.  After surgery on both of her hands, she was ordered to "scan the docks," involving pulling freight out from under the conveyor belt to scan.  Foreman testified that FEC knew she was not supposed to be grabbing things and that some of the boxes weighed between 40 and 60 pounds.  *Id.* at 101, 104.  She also had to pull cans off the semi.  *Id.* at 105.  On one occasion, she and Parsley were to load uniforms in boxes and carry the boxes to the shed. *Id.* at 105.  The manager ordering this work was Jeff Sparks.  *Id.* at 106.

Parsley was also ordered to pick up trash by Sparks, but there was no one to act as the gatekeeper other than Parsley, so she was able to avoid the trash detail. [Parsley Dep., p. 129]. She also was required to unload cans off a truck, despite a five-pound restriction.  *Id.* at 129.

In support of their claims regarding the trash detail, Plaintiffs rely in part on the testimony of J. P., who was also on light duty for carpal tunnel and was ordered to pick up trash that day. She, Foreman and Parsley had all complained about sexual harassment.   J. P. filed a formal internal complaint with FEC about the trash detail.   The response by Managing Director Robert Center said, "Our investigation did identify some practices that may be inconsistent with our policies, culture and philosophy.  Appropriate recommendations were made for your management team to implement to address these practices." [DE 65, Exs. ZZ, AAA].  J. P. also testified that she had been on light duty three times in the past and had never been asked to pick up trash. [Prewitt Dep. , pp. 43-44].

Drane, another courier,  testified that he was on light duty during that same time frame, and he was assigned office work.  He was never directed to pick up trash, unload cans, or upload cans. [Drane Dep., pp. 22-23].   Browning testified that when she was on light duty, she researched packages and that was the main thing light-duty employees did. [Browning Dep., p. 68].

FEC responds to this claim by noting Foreman's testimony that none of the trash weighed more than five pounds, which was the only restriction of which FEC had notice. [Foreman Dep., p. 103]. FEC said Foreman testified that her manager moved heavy items for her, but Foreman's testimony was that Parsley was on restrictions for her foot and they were able to move the items while working together. *Id.* at 108. Parsley testified that the only time she encountered a box heavier than five pounds, she notified Sparks and he got someone else to move it. [Parsley Dep. pp, 192-193]. FEC also provides the Declaration of Sparks that five other employees had been asked to pickup trash, and there was no evidence any of them had engaged in any protected activity. [DE 67, p. 4].

FEC also denies any causal link between the retaliation and any protected activity. Sparks ordered the trash pick up, but had no knowledge that Foreman, Parsley or J. P. had made any claim. Ehney may have had knowledge of the claims, but he did not tell Sparks who to choose to pick up trash. Accordingly, FEC contends that Foreman cannot establish a prima facie case of retaliation.

Regarding Parsley's claim of increased workload, FEC notes that couriers' workloads fluctuated with volume and Parsley could not say her workload increased more than any other courier. She also testified that some of the work was taken away later. [Parsley Dep. p. 176].

Regarding Parsley's claim that her work performance was criticized, she could only recall one incident when she had late deliveries and had no idea whether other couriers with late deliveries were also criticized. *Id.* at 154-55; 177. Norwood's Declaration states that Parsley was not criticized any more than any other courier performing comparable work. *Id.* at ¶ 18.

Parsley alleges retaliation because her route was reassigned after she was on leave for ninety days. However, Parsley admits that re-bidding a route after ninety days is consistent with FEC policy. *Id.* at 131-132.

Regarding the Louisville job that Parsley wanted, the evidence is that McCarty looked into Browning's appointment after Parsley complained and agreed that Browning was not qualified. McCarty had Browning's offer rescinded.  FEC contends that Parsley was offered the exact same job and she turned it down. [DE 67, p. 43].  Moreover, the job offers were made by the manager from the Louisville facility, and there is no evidence that she knew that Parsley engaged in any protected activity.

The Court agrees with FEC that Foreman and Parsley have failed to show any materially adverse actions or that they were caused by protected activity.  Accordingly, summary judgment will be granted on their retaliation claims.

### E.    Punitive Damages

"A Title VII claimant is entitled to recover punitive damages only when she can demonstrate by a preponderance of the evidence that the employer 'engaged in a discriminatory practice ... with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Parker v. General Extrusions, Inc.*, 491 F.3d 596, 602 (6th Cir. 2007).  Punitive damages are available under Title VII "if the plaintiff establishes that (1) the employer acted with knowledge that its actions may have violated federal law, and (2) the employees who discriminated against her are managerial agents acting within the scope of their employment.  However, an employer may avoid liability, nonetheless, if it shows that it engaged in good-faith efforts to implement an anti-discrimination policy."  *West v. Tyson Foods, Inc.*, 374 F. App'x. 624, 636 (6th Cir. 2010).  In determining good faith, it is appropriate to consider not only whether "the defendant employer had a written sexual harassment policy," but also "whether the employer effectively publicized and enforced its policy."  *Id.*, quoting *Parker*, 491 F. 3d at 603.  "An employer is deemed to have notice of harassment reported to any supervisor or department head..."  *Gallagher*, 567 F.3d at 277.  "An employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser...."  *Hawkins*, 517 F.3d at 341.

In the present case, Plaintiffs rely on the following facts in support of their claim of punitive damages. Fusco was an operations manager and reported directly to Ehney, the general manager. Fusco had received anti-harassment training. [DE 43-10, Fusco Decl. at ¶ 3]. Plaintiffs incorrectly state that A.B. complained to Fusco in 2006. Nonetheless, the complaint was to her supervisor, Carr, who also had anti-harassment training. [DE 43-5, Carr Decl. at ¶ 3]. Carr apparently did not report the complaint to HR as required under the Anti-harassment Policy, since McCarty said there were no complaints about Tubbs on file. [McCarty Decl. at ¶¶ 14, 18]. S. G. reported sexual harassment by Tubbs to Fusco three times in 2007. He told her to "stay clear" and said, "I will not let you ride with them alone." S. G. Dep., pp. 18, 26-27, 75-78. In 2008, Foreman told Fusco he needed to talk to Tubbs because he was getting pretty nasty. Fusco simply laughed. [Foreman Dep., pp. 48-49]. There was no inquiry regarding what had happened to S. G. or Foreman, no investigation, and the complaints were apparently not passed on, since there was nothing in McCarty's file. In 2009, there were reports to Fusco of Tubbs' harassment from Foreman, Parsley, N. H. and D. S. The response was to move Tubbs' truck four trucks away from Parsley, to require Tubbs to walk in front of the trucks, and to issue a Warning Letter to Tubbs.

In *West*, the court held there was sufficient evidence to present a jury question on punitive damages when there "was evidence of widespread disregard of the policy by employees in engaging in harassment, by supervisors in not reporting to HR incidents of harassment or failing to conduct follow-up investigations, [and] by co-workers in not reporting incidents...." *West*, 374 F. App'x at 639.

Viewing the evidence in the light most favorable to the non-moving party, Plaintiffs have presented sufficient evidence of management's disregard of FEC policies to raise a jury question on whether Plaintiffs are entitled to punitive damages.

III.    **CONCLUSION**

A.      FEC's motion for summary judgment on all claims by Plaintiff Aytes [DE 41] is **GRANTED**;

B.      FEC's motion for summary judgment on Plaintiff Foreman's claims [DE 42] is **GRANTED** with respect to her state law sexual harassment claims and all of her retaliation claims, but is **DENIED** on her Title VII sexual harassment claims and punitive damages;

C.      FEC's motion for summary judgment on Plaintiff Parsley's claims [DE 43] is **GRANTED** as to her state law sexual harassment claims and all of her retaliation claims, but is **DENIED** on her Title VII sexual harassment claims and punitive damages;

This May 18, 2012.



**Signed By:**

**_Karl S. Forester_**   $K S F$

**United States Senior Judge**